**STATE of Missouri, Respondent,**

v.

**Ronald TREADWAY, Appellant.**

No. 58122.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 12, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 16, 1991.

Application to Transfer Denied
June 11, 1991.

---

59

Beverly A. Beimdiek, St. Louis, for appellant.

William L. Webster, Atty. Gen., Ronald L. Jurgeson, Asst. Atty. Gen., Jefferson City, for respondent.

GARY M. GAERTNER, Presiding Judge.

Appellant, Ronald Treadway, appeals his jury convictions of two counts of burglary in the first degree, RSMo § 569.160 (1986) and three counts of robbery in the first degree, RSMo § 569.020 (1986). Appellant was sentenced, as a Class X offender, to ten years imprisonment on each of the burglary convictions and to three life terms on the robbery convictions. One of the life terms is to be served concurrently; all other sentences are consecutive. On appeal, appellant contends that the trial court erred in denying his motion to strike a juror for cause and in overruling his motion to suppress identification. We affirm.

On May 27, 1989, Walter Drbul and his roommate, Alan Jobe, were in their first floor apartment watching a televised basketball game. At approximately 6:00 p.m., two individuals carrying knives, one of whom was later identified as the appellant, entered their apartment and approached the two roommates. The roommates were ordered to lie on the floor and were tied up with cords cut from the room's telephone and from the room's cable T.V. service. Both roommates testified that the intruders asked questions about the location of valuables and beat and kicked the roommates when the intruders were not satisfied with the answers given. At one point, one of the intruders cut both roommates on their backs.

Both roommates were able to view the intruders. Mr. Drbul estimated that he viewed the intruders for three to five minutes. Mr. Jobe testified that he viewed the intruders for two to three minutes.

During the course of the robbery, one of the intruders slashed Mr. Drbul's water bed. Kristen McKersie, a resident in the basement apartment, testified that some time that evening, water began pouring through her ceiling. After she tried, unsuccessfully, to contact Mr. Drbul or Mr. Jobe, she went to what, apparently, was a

stairwell in the back of her apartment to retrieve a bucket to clean up the mess. As she reached down to pick up the bucket, she heard noises on the landing above her and saw the appellant. The appellant attempted to lure Ms. McKersie into the Drbul apartment and, when she refused, threatened to kill her. Ms. McKersie went back into her apartment to call the police.

The next evening, Wayne Talley was watching television in his second floor apartment when he heard a knock on the door. As he opened the door, two men, one of them identified as the appellant, burst in and began fighting with Mr. Talley. The intruders eventually subdued Mr. Talley and tied him up. The intruders remained in the apartment for approximately one hour. Mr. Talley was able to view the intruders for most of that time.

On May 29, 1989, two detectives with the St. Louis City Police Department informed Mr. Drbul, Mr. Jobe and Ms. McKersie that they had picked up some suspects and had some pictures for the three of them to look at. The group met with the detectives in Ms. McKersie's apartment. The detectives presented each of the witnesses with at least one book of photos and some separate photos. Each witness viewed the pictures separately. After all three witnesses viewed the pictures, they were asked to sign the back of any of the photographs they identified as one of the intruders. All three witnesses testified that they did not discuss their identifications with each other prior to signing the backs of the pictures, and that they did not look at the back of the pictures prior to signing them. Mr. Drbul testified that he was one hundred percent sure of his identification, Mr. Jobe testified that he was ninety-five percent sure about his identification and Ms. McKersie was seventy percent sure. All three witnesses testified that no comments were made by the police to highlight any of the pictures shown to the witnesses.

Later that same day, the same two detectives took the collection of photographs over to Mr. Talley's residence. Mr. Talley was shown five photos and identified two of them. Mr. Talley signed his name on the back of the photos he identified. No comments were made by police to Mr. Talley regarding the photos and he was not permitted by the detectives to turn any of the photos over until after he had made his identifications. Mr. Talley testified that he was one hundred percent sure of his identification of appellant.

Appellant was charged with four counts of robbery in the first degree and three counts of burglary in the first degree on June 12, 1989. An indictment was issued on those same charges on July 3, 1989.[1] On January 23, 1990, a substitute information in lieu of indictment was filed alleging that appellant was a Class X offender.

The trial on the charges commenced on January 23, 1990, and ended on January 25, 1990, with five guilty verdicts. This appeal followed.

Appellant first claims that the trial court erred in denying his motion to strike a venireman for cause. We disagree.

During voir dire, counsel for appellant asked Venireman Chenoweth if he would still want to hear from the appellant if the judge instructed him that the failure of the appellant to take the stand could not be taken into consideration:

VENIREMAN CHENOWETH: Yes, I would.

MS. BEIMDIEK: If you didn't hear from him and the Judge gave you that instruction, would you be able to follow the law that says you couldn't take that into consideration?

VENIREMAN CHENOWETH: I think the pendulum of justice has swung so far there's so many criminals out on the street even when they are convicted that the system doesn't do the criminal system any justice, in my opinion. There's so many criminals being let out today it's almost a farce, this whole thing. Every time you turn around you're reading somebody getting killed and the person

1. One charge of burglary in the first degree and one charge of robbery in the first degree were nol prossed on January 22, 1990.

that got victimized is the one that's in trouble and the person that did it is gone.

MS BEIMDIEK: Do you think you may feel this way in this case that Ronald must be guilty?

VENIREMAN CHENOWETH: I don't say Ronald is guilty or not, but I'm just saying the judicial system as a whole is so grossly one way that it's for criminals, not for the person that's innocent.

MS. BEIMDIEK: And you think there are too many privileges afforded to criminal defendants?

VENIREMAN CHENOWETH: Yes.

MS. BEIMDIEK: And you think it might affect your ability to sit on this case?

VENIREMAN CHENOWETH: Yes.

MS. BEIMDIEK: Does anybody else think that criminal rights have too many privileges in this system? Am I summarizing?

VENIREMAN CHENOWETH: I think so.

MS. BEIMDIEK: Does anybody agree with Mr. Chenoweth? Mr. Calton?

VENIREMAN CALTON: Yes. The one trial I did sit on, the mistrial was inadmissible evidence that had little bearing on the case, but he got free.

MS. BEIMDIEK: Okay, and do you think that that was unfair because somebody who you thought was guilty was allowed to go free?

VENIREMAN CALTON: Right, this was right toward the end of the trial.

MS. BEIMDIEK: Do you think that that would have an effect on your ability to sit on any case because you think people are getting too many breaks and somebody gets off on a technicality?

VENIREMAN CALTON: Yes, the technicality of it which is the law, we've got to live within that framework or find a way to change it. I get frustrated at times.

MS. BEIMDIEK: Do you think that would affect your ability to sit on this case in some way?

VENIREMAN CALTON: Not with the Judge giving me the directions, no, no problem.

MS. BEIMDIEK: But you still would tend to agree that maybe defendants have too many rights and victims don't have enough rights?

VENIREMAN CALTON: In certain cases, yes.

MS. BEIMDIEK: You understand you haven't heard anything in this case. Would you be able to evaluate this case separately from your general feelings?

VENIREMAN CALTON: Yes

Venireman Chenoweth was later struck for cause and Venireman Calton was preemptorily struck by appellant. On appeal, appellant claims that the trial court erred in failing to strike Venireman Calton for cause because he "expressed an identical attitude" as Venireman Chenoweth.

■ We first note that appellant's basis for complaint is not, as he claimed in his motion for a new trial, based on the United States Constitution. In *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the defendant had to resort to one of his peremptory challenges to remove a juror who should have been removed for cause. *Id.* 108 S.Ct. at 2275. On appeal, the defendant claimed that, by forcing him to use a peremptory challenge to strike the venireperson, he was denied his Sixth and Fourteenth Amendment rights to an impartial jury. The Supreme Court, in rejecting this argument, held that "any claim that the jury was not impartial … must focus not on [the peremptorily struck juror] but on the jurors who ultimately sat." *Id.* at 2277. The court also noted that peremptory challenges are not constitutionally required. *Id.* at 2278. The loss of a peremptory, therefore, did not violate the United States Constitution. *Id.*

Like *Ross, State v. Wacaser*, 794 S.W.2d 190, 193 (Mo. banc 1990), involved a venireman who should have been struck for cause and was, eventually, peremptorily struck by the defendant. In *Wacaser*, the Missouri Supreme Court pointed out that RSMo § 546.180.3 required "a list of jurors found by the court to be *qualified to sit* in the case" prior to the taking of peremptory strikes. *Wacaser*, 794 S.W.2d at 192 (em-

phasis added). The court then stated that "[a] juror who should be excluded for cause ... is not a 'qualified' juror under § 546.180.3." *Id.* at 193. The court, thus, held that the defendant's complaint was based on statutory, not constitutional, law. *Id.*

■ In 1989, RSMo § 546.180.3 was repealed by the Missouri legislature. The replacement section, however, RSMo § 494.480 (1989), contains similar language to that contained in § 546.180.3. See RSMo § 494.480.4 (1989). We, consequently, hold that the modification of the statute has not changed the right of a defendant to have a full panel of qualified jurors prior to the making of peremptory strikes.

■ To qualify as a juror, the venireman must be able to enter upon that service with an open mind free from bias or prejudice. *State v. Walton*, 796 S.W.2d 374, 377 (Mo. banc 1990). The trial court has the duty to make an independent inquiry only when a venireman equivocates about his ability to be fair and impartial. *Id.* However, where an answer to a question suggests the possibility of bias and, upon further questioning, the venireman gives unequivocal assurances of impartiality, the bare possibility of prejudice will not disqualify the venireman or deprive the trial judge of discretion to seat the venireman. *Id.* It must clearly appear from the evidence that the challenged venireperson was in fact prejudiced. *Id.*

■ A trial court has wide discretion in determining the qualifications of prospective jurors and the reviewing court will not disturb the trial court's ruling on a challenge for cause absent a clear abuse of discretion and a real possibility of injury to the complaining party. *State v. Feltrop*, 803 S.W.2d 1, 7 (Mo. banc 1991). Any doubts as to the trial court's findings are resolved in the trial court's favor. *Walton*, 796 S.W.2d at 378.

■ In the present case, while Venireman Calton may have believed that, "in certain cases", defendants have too many rights, he unequivocally and clearly expressed that he would have "no problem"

sitting on the case. His views were far different from Venireman Chenoweth, who stated unequivocally that he wanted to hear from the appellant regardless of the instructions given by the trial judge. Venireman Calton stated that he would have no problem sitting on the case with the trial judge giving him the "directions" and could evaluate the case separately from his general feelings. The trial court did not commit error.

■ Appellant next claims that the trial court erred in denying his motion to suppress identification because the "identification process used by police was impermissibly suggestive." Appellant's claim seems to have two bases; 1) there were names on the bottoms of the pictures shown to the witnesses; and 2) the witnesses were asked to sign their names on the backs of the photos and the witnesses may have seen the other witnesses' signatures when viewing the pictures.

The arguments of appellant are built solely on surmise and conjecture. All of the witnesses testified that they did not notice the names on the bottom of the photos until after they had made their identifications. In addition, all of the witnesses testified to not looking at the backs of the photos before identifying the appellant. There was no evidence that the police made any improper suggestive remarks. Finally, to say that the witnesses' identifications were reliable, would be a gross understatement. See *State v. Charles*, 612 S.W.2d 778, 780 (Mo. banc 1981). Point denied.

Affirmed.

CRANDALL, C.J., and CRIST, J., concur.